**Eileen M. FITZPATRICK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Cheryl Ann and Alan KEHNAST, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 88–270–CMW, 88–82–CMW.**

United States District Court, D. Delaware.

Jan. 2, 1991.

Elwood T. Eveland, Jr., of Woloshin, Tenenbaum & Natalie, Wilmington, Del., for plaintiff Fitzpatrick.

Robert Pasquale, and Arthur M. Krawitz, of Doroshow, Pasquale & Linarducci, Wilmington, Del., for plaintiffs Kehnasts.

William C. Carpenter, Jr., U.S. Atty., and Patricia C. Hannigan, Asst. U.S. Atty., Wilmington, Del., for defendant.

## OPINION

CALEB M. WRIGHT, Senior Judge.

Plaintiffs Cheryl Ann and Alan Kehnast brought this action in this Court pursuant to 28 U.S.C. § 2671, *et seq.*, (the Federal Tort Claims Act) on February 19, 1988, against Defendant United States of America. Plaintiff Eileen M. Fitzpatrick also commenced an action in this Court pursuant to the Federal Tort Claims Act on May 20, 1988, against Defendant United States of America and Willie D. Davis.[1] These actions were consolidated by an Order of this Court issued on March 14, 1989.

Plaintiffs seek to hold the United States liable for injuries allegedly caused by the negligence of Willie D. Davis, a Sergeant in the United States Army. Plaintiffs claim that Sergeant Davis was acting within the scope of his employment when his government-leased vehicle collided with the stationary vehicle occupied by Cheryl Ann and Alan Kehnast which subsequently collided with the Fitzpatrick vehicle, also stationary.

The Plaintiffs Cheryl Ann and Alan Kehnast also seek to hold the United States liable on a claim of negligent entrustment (of a motor vehicle).[2]

This Court has Jurisdiction pursuant to 28 U.S.C. § 1346(b).

For the reasons which will be stated herein, the Court enters judgment against the Defendant United States of America and in favor of the Plaintiffs and awards to the Plaintiff Cheryl Kehnast the sum of $64,720.00, to the Plaintiff Alan Kehnast the sum of $46,300.00 and to the Plaintiff Eileen Fitzpatrick the sum of $29,500.00.

### A. *Findings of Facts*

1. The Accident of March 15, 1985

In March of 1985, Willie D. Davis was a Sergeant First Class in the United States Army assigned to Readiness Group Meade, at Fort Meade, Maryland. Sergeant Davis' position was Senior Medical Sergeant which included the responsibility of acting as a medical advisor for the National Guard and Army Reserves in Delaware. Sergeant Davis' position involved assisting in the training of members of the Army Reserves and National Guard on the proper operation of a military medical unit. This position would require Sergeant Davis to travel, frequently for weekend drills, from Fort Meade to the particular location of the National Guard or Army Reserve Unit he was to assist. For such travel Sergeant Davis was authorized to operate a government vehicle and to make his own arrangements for food and overnight accomodations.

On Friday, March 15, 1985, Sergeant Davis obtained a government-leased vehicle from the motor pool at Fort Meade. He then proceeded to drive this vehicle to New Castle, Delaware to participate in the activities of the 116th M.A.S.H. unit of the National Guard over the weekend. Sergeant Davis could not recall what time he arrived in Delaware but remembered checking into a motel and going over and visiting the 116th unit. (Tr 465). He be-

---

1. Plaintiff Fitzpatrick filed a Notice of Dismissal on May 23, 1989 dismissing without prejudice her claim against Willie D. Davis.

2. By an Order dated August 15, 1988 this Court granted Plaintiffs Cheryl Ann and Alan Kehnast's motion to amend their original complaint to add this claim.

lieves the 116th unit was closed or the person he was supposed to see wasn't there so he went next door to the officers' club to look for this person. (Tr 465).

The subsequent events after Sergeant Davis entered the officers' club are contained in an interview of Sergeant Davis, as to this trip to Delaware and the accident which occurred while on this trip, that was conducted by Captain Kenneth Grant, of the Judge Advocate General Corps., on April 16, 1985 (the Grant Memorandum).[3] According to this interview Sergeant Davis arrived at the National Guard Unit in Delaware at about 6:00 P.M. on March 15, 1985. Sergeant Davis then attempted to contact Specialist Ralph Scott, the trainee NCO for the 116th M.A.S.H. unit, but was unsuccessful. He then went to the officers' club for the purpose of locating Captain Hayes, the unit executive officer. Upon learning that Captain Hayes was not at the club, Sergeant Davis remained at the officers' club, during which time he consumed alcohol, socialized, and played pool. Sergeant Davis spoke intermittently with a Lieutenant Kearns and they played pool together. They discussed among other things Lieutenant Kearns' job responsibilities within the unit.

At trial Sergeant Davis testified that he remembered leaving the officers' club (Tr–475), but was unable to recall the time without looking at the memorandum of his interview with Captain Grant. Sergeant Davis did state at trial that he believed when he left the club he was headed to the Macintosh Inn where he had checked in previously that evening. (Tr–475). Sergeant Davis supported this belief by his statement at trial that he did not know anywhere else to go in Delaware. All that Sergeant Davis was able to recall at trial

prior to the automobile collision, up until the next morning, was driving down a street and approaching a light and perceiving there to be three cars ahead of him. At this point Sergeant Davis blacked out. (Tr–475).

According to the memorandum prepared by Captain Grant, it was about 9:30 P.M. when Sergeant Davis left the officers' club on route to his motel billet. While on his way to the motel, Sergeant Davis collided with the last of three cars stopped at a traffic signal on Route 71, near Churchman's Road, in New Castle, Delaware. The vehicle Davis was driving hit the vehicle of the Plaintiffs Cheryl Ann and Alan Kehnast, which struck the vehicle of the Plaintiff Eileen M. Fitzpatrick, which in turn hit a vehicle driven by Mr. William Sebok. The police were summoned by witnesses to the scene of the accident and upon arriving arrested Sergeant Davis for Driving Under the Influence of Alcohol. Sergeant Davis submitted to a breathalyzer test at Delaware State Police Troop 6 and this test indicated a blood alcohol level of 0.20.

The Plaintiff Cheryl Kehnast was taken to the hospital by ambulance and suffered injuries as a result of this accident. The Plaintiff Alan Kehnast accompanied his wife in the ambulance to the hospital. He did not recieve any care at the emergency room at this time but was subsequently treated the next day for injuries suffered as a result of this accident. The Plaintiff Eileen Fitzpatrick was also taken to the hospital by ambulance and suffered injuries as a result of this accident.

### 2. Injuries of Plaintiff Cheryl Ann Kehnast

The Plaintiff Cheryl Ann Kehnast was 28 years old and a passenger in the front seat

---

**3.** The Grant Memorandum is admissible as an exception to the hearsay rule under Fed.R.Evid. 803(5) and 803(6). The Grant Memorandum is admissible under F.R.E. 803(5) as past recollection recorded. At trial Sergeant Davis had an impaired memory as to the events surrounding the accident. It appears that the events were fresh in Davis' mind at the time of the interview, as the interview occurred on April 16, 1985, only one month after the date of the accident. The Grant Memorandum is also ad-

missible under F.R.E. 803(6) as a business record since it was the regular practice of the U.S. Army Claim Office to create a packet as to each Federal Tort Claims Act case filed with that office. A routine element of the packet would be a memorandum of any interviews conducted of the United States armed services personnel involved in a claim. Captain Grant routinely conducted such interviews as part of his regular duties. (see deposition of Captain Grant at p. 8).

of an automobile driven by her husband, Alan Kehnast, on March 15, 1985, at the time, when the Kehnast's vehicle was struck by the vehicle operated by Sergeant Davis. The force of the impact caused Ms. Kehnast's left shoulder to hit against the dashboard and her knees to be forced underneath the seat. She was not wearing a seatbelt at the time of the impact. Ms. Kehnast came to rest on the floor of the vehicle. Ms. Kehnast was taken by ambulance to the hospital where x-rays were taken, her knees, legs, and shoulder were examined, her shoulder was immobilized in a sling, and she was given pain medication.

John R. Smoluck, M.D., a board certified orthopedic surgeon who has special interest in injuries involving the shoulder and knee examined Cheryl Kehnast on March 18, 1985. Ms. Kehnast related the history of being involved in an automobile accident and the pain she was having around her shoulder and in the low back and the general soreness she was having around the neck. After examining Ms. Kehnast Dr. Smoluck agreed with the diagnosis made in the emergency room of an acromioclavicular sprain. (Tr–358).[4] At this time Dr. Smoluck continued to have Ms. Kehnast wear the sling.

The next visit with Dr. Smoluck was on April 4, 1985. At this time Dr. Smoluck advised Ms. Kehnast to continue wearing the immobilization strap and to begin a program of physical therapy. (Tr–363). Dr. Smoluck stated that he believed Ms. Kehnast started physical therapy at this time and regularly attended it for at least several months, if not longer. (Tr–366). Dr. Smoluck, however, did not find that the therapy was helping to alleviate her symptoms as she was still experiencing a lot of pain around the shoulder on her next scheduled visit of April 29, 1985.

On June 3, 1985, after several visits to Dr. Smoluck, physical therapy, an arthrogram and x-rays, additional prescriptions for pain medication, and continuing immobilization of her shoulder, Ms. Kehnast continued to have pain, soreness and limited motion around the shoulder and was experiencing clicking and grinding in the shoulder. (Tr–367). At this visit on June 3, 1985, Dr. Smoluck recommended arthroscopy in order to allow him to directly visualize the shoulder joint.[5] The arthroscopy was performed on June 21, 1985. Upon examination, Dr. Smoluck found Ms. Kehnast's shoulder to be unstable anteriorly and diagnosed a posteroanterior dislocation of the shoulder, anterior instability of the shoulder and a large articular defect of the posterior aspect of the humerus. (Tr–369).[6] Dr. Smoluck viewed the findings upon doing the arthroscopy as consistent with a traumatic dislocation of the shoulder. (Tr–371).

As of Dr. Smoluck's September 4, 1985 examination of Ms. Kehnast, she had experienced a recurrent episode of dislocation of her shoulder three weeks prior,[7] and as she had spent a lot of time in physical therapy, Dr. Smoluck believed the criteria indicatied ongoing instability and therefore, recommended surgery. (Tr–376). On Oc-

---

4. This is also referred to as the AC joint and is the location where the collar bone meets the shoulder.

5. The concept of arthroscopy is use of an optical instrument, which has a diameter about the size of a ball point pen, to insert the instrument into the joint, to enable the examiner to actually see the structures within the joint, including the surface of the joint, the end of the bone adjacent to the joint surface, soft tissue elements and shoulder, including tendons and the cartilage rim inside the shoulder referred to as the glenoid labrum. (Tr–368).

6. When a shoulder is dislocated, the soft tissue constraints about the shoulder and frequently the joint surface itself are damaged when the ball of the shoulder exits the joint. This results in a defect or an abrasion on the joint surface and also a compression of the bone at the upper end of the humerus. (Tr–370).

7. Dr. Smoluck stated that the original insult to cause a dislocation of the shoulder is a significant traumatic event and that it does not just happen with a minor episode. A subsequent dislocation according to Dr. Smoluck does not require the same type of force that is necessary to cause the initial dislocation. He stated that a subsequent dislocation can occur with relatively trivial action or movement if there is ongoing instability of the shoulder. (Tr–421–22). Ms. Kehnast was attempting to throw a basketball when this dislocation occurred.

tober 5, 1985, a Bristow procedure was performed. The purpose of the procedure is to reinforce the structures in the front of the shoulder that have been damaged or stretched as a result of the original trauma. The Bristow procedure accomplishes this goal by reinforcing the capsule and the rotator cuff tendons in the front of the shoulder by transposing a prominence of bone that is normally present as part of the scapula into a position where it tightens the capsule and the tendons in the front of the shoulder. When that bone is transferred, it is secured in its new position with a screw that holds it in place while the bone heals in the new location. (Tr–377–78). Ms. Kehnast experienced severe nausea after the surgery. (Tr–378). Her arm was immobilized after the surgery.

In the months after the surgery Ms. Kehnast continued to have weakness in her shoulder, a limited range of motion in her shoulder, and pain in the front of the shoulder and intermittent numbness. Dr. Smoluck estimated that Ms. Kehnast had a permanent partial disability of between 30–40% of the use of her left shoulder, based on his examination of her on October 30, 1989 and the Cybex evaluation [8] which revealed significant weakness in all six major directions about the shoulder.[9] (Tr–391, 394).

8. Cybex testing is a computerized isokinetic testing equipment which provides a fairly accurate and very reproducible method of isolating the different motions about the various joints. (Tr–390).

9. The Court will not take into account Dr. Case's opinion as to the diminished percentage in permanency which may have resulted to Ms. Kehnast if she had undergone the shoulder manipulation when first recommended in 1986, for two reasons. (Tr–523–24). First, as pointed out by the Plaintiffs the report of Dr. Case given to the Plaintiffs, by the United States, in response to discovery did not contain this particular opinion by Dr. Case. Secondly, the Court does not believe that Ms. Kehanst is obligated to undergo a subsequent manipulation as the certainty of its improving her condition is unpredictable. Dr. Smoluck her treating physician described the manipulation as a "first attempt or first step at trying to improve that problem ...". (Tr–398–99).

Dr. Smoluck, Ms. Kehnast's treating physician, stated that Ms. Kehnast's complaints of limited motion in her shoulder, pain in the front of her shoulder, and intermittent numbness at different times are all accepted and known consequences of the original injury to her left shoulder, a dislocation, which resulted from the motor vehicle accident in March of 1985. Also these symptoms could be related to the necessary procedure that was done to correct the instability problem.[10] (Tr–395–96).

As to whether Ms. Kehnast will require future surgery, Dr. Smoluck stated that there is the possibility of removing the screw but he couldn't gaurantee that it would help. Also he suggested the possibiltiy of manipulating the shoulder but stated that as time goes on it is less predictable that such a procedure will in fact help. (Tr–396–97). The other possibility mentioned by Dr. Smoluck was another arthroscopy of the shoulder to determine if any other reasons exist for the continued limitation of motion. However, Dr. Smoluck stated that the outcome of this procedure would also be uncertain. (Tr–399–400).

3. Injuries of Plaintiff Alan Kehnast

a. *Cervical Radiculopathy and Thoracic Outlet Syndrome* [11]

The Plaintiff Alan Kehnast was 33 years old and the driver of his vehicle which was

10. Dr. Jerry Case, an orthopedic surgeon, examined Cheryl Ann Kehnast at the request of an attorney for the United States on May 25, 1989. Dr. Case stated that he thought Ms. Kehnast had a permanent partial impairment of the left upper extremity, which was caused by her accident and subsequent surgical procedure. Dr. Case rated Ms. Kehnast's disability at twenty-five percent.

11. The Defendant United States of America has put forth two arguments for discrediting the diagnosis of thoracic outlet syndrome for Alan Kehnast. These arguments are as follows: 1. The majority of the tests relied upon by a physician in making such a diagnosis depend on the subjective history given by the patient and there are no objective confirmatory diagnostic tests; 2. Alan Kehnast did not exhibit any of the symptoms of thoracic outlet syndrome referenced in an admittingly authoratative text. The Court, however, believes that the treating physicians who examined Alan Kehnast, Dr. Davies and Dr. Monteleone, were able to make such a

stopped at a light at the intersection of Churchman's Road, on March 15, 1985, at the time, when it was struck by the vehicle operated by Sergeant Davis. The impact caused his vehicle to strike the vehicle in front of it which was occupied by the Plaintiff Eileen Fitzpatrick.

Dr. Monteleone, a neurologist, first examined Alan Kehnast on June 11, 1985. His complaints at this time were a loud ringing noise in the left ear, headaches, dizziness, a muscle spasm in the left arm and loss of strength in the left arm. (Tr-116). There is some discrepancy as to what occurred upon impact to Mr. Kehnast. At trial Mr. Kehnast testified that he hit his head on the left cornerpost of his car but Dr. Monteleone testified that he told him he had hit his head on the steering wheel and the dashboard. (Tr-116). There was also some evidence that would indicate that Mr. Kehnast did not hit his head at all.[12] In any event Dr. Monteleone's findings as a result of this examination were a spasm of the trapezoid (the muscles in the back of the neck), weakness in his hand grip, and decreased reflexes of the left arm. (Tr-116). Dr. Monteleone's impression as to Mr. Kehnast's hearing problem was a concussion syndrome and cervical radiculopathy. (Tr-118).[13]

After an EEG and EMG were performed Dr. Monteleone's diagnosis on July 18, 1985 was cervical radiculopathy and thoracic outlet syndrome. (Tr-121).[14] In April, 1986, Dr. Monteleone decided that physical therapy, trigger blocks, and muscle relaxants were not working to alleviate Mr. Kehnast's complaints of muscle spasms, headaches, shoulder pain, and sluggish re-

flexes so he referred him to Dr. Davies, a thoracic surgeon. (Tr-133).

Dr. Davies saw Mr. Kehnast initially on April 24, 1986 at which time Mr. Kehnast related the history of an automobile accident and his problems of numbness, tingling, and pain in his left arm. (Tr-260). After examining Mr. Kehnast, Dr. Davies diagnosed thoracic outlet syndrome on the left side and recommended surgery to remove the first rib. (Tr-268). Dr. Davies stated that thoracic outlet syndrome is often seen when there has been antecedent trauma and that the history of an automobile accident is consistent with such a diagnosis. (Tr-283-84). Dr. Davies believes that nothing would relieve Mr. Kehnast's symptoms except decompressing or taking the pressure off the first rib by surgery. (Tr-269). Dr. Davies states that Mr. Kehnast will require surgery in the future to alleviate the symptoms of the thoracic outlet syndrome. (Tr-285).

Dr. Monteleone also stated that, within reasonable medical probability, Mr. Kehnast's cervical radiculitis and thoracic outlet syndrome are directly related to the automobile accident.[15] (Tr-138-39). He also states that the history of injury as described by Alan Kehnast is consistent with a diagnosis of thoracic outlet syndrome. (Tr-139). Dr. Monteleone is of the opinion that Mr. Kehnast has sustained a 20% permanent disability of his left arm as a result of thoracic outlet syndrome. (Tr-139). Dr. Monteleone states that Mr. Kehnast's symptoms from the thoracic outlet syndrome and the cervical radiculopathy are permanent in nature. (Tr-139-40). He has placed restrictions on Mr. Kehnast in

diagnosis based on their medical training and experience.

12. Dr. Monteleone commented when asked that if Alan Kehnast didn't hit his head, he could not have had a concussion. He further stated, however, that the concussion was the least problematic part of his problem. (Tr-167).

13. Dr. Monteleone explained that cervical radiculopathy is an irritation of the nerve root and in this case the nerve root was coming out from the neck region.

14. Dr. Monteleone explained that thoracic outlet syndrome is pressure on the nerve going

through the thoracic outlet. It involves a stretching and compression of the nerve going through the thoracic outlet. The thoracic outlet is mainly formed by the first rib and the scalenus muscle and in order for the nerve to go into the arm it must go through the thoracic outlet. (Tr-120-21).

15. Dr. Monteleone stated that Alan Kehnast's concussion on September 9, 1986 from striking his head on a tree limb, had no bearing on his current problems resulting from the March 15, 1985 accident. (Tr-136).

lifting, pushing, pulling, and working with his arm over his shoulder, and lifting more than 10–20 pounds on a repetitive basis. (Tr–140). It is Dr. Monteleone's opinion that if Mr. Kehnast exceeds these limitations, his condition would be expected to become worse.

### b. Hearing Loss and Tinnitus [16]

Mr. Kehnast also had complaints of hearing loss in his left ear and tinnitus,[17] after the accident of March 15, 1985. Dr. Rosenberg, a board certified otolaryngologist, examined Mr. Kehnast on August 22, 1989 and found the audiograms concerning Mr. Kehnast to reflect a mild high frequency hearing loss in his left ear. Within reasonable medical probability Dr. Rosenberg believes that Mr. Kehnast's tinnitus is consistent with the type of hearing loss he had sustained. (Tr–577). Dr. Rosenberg attributed Mr. Kehnast's hearing loss, based on his history and on the audiograms, to the accident, which probably caused a slight concussion to the inner ear, in turn causing the hearing loss and the tinnitus. (Tr–583). Dr. Rosenberg uses hearing aids in the treatment of tinnitus because a hearing aid in itself can amplify the ambient sounds in the room so that it will help mask the sound of the tinnitus. (Tr–583). If that alone is not adequate, a masking sound can be added by having the hearing aid produce a sound. (Tr–583).

Dr. Robinson, a board certified otolaryngologist, examined Mr. Kehnast on May 22, 1989. Dr. Robinson determined that Mr. Kehnast had a slight high frequency hearing loss in the left ear due to the accident. (Tr–440). Dr. Robinson testified that according to the AMA guidelines this level of hearing loss would not be described as an impairment. (Tr–440). Dr. Robinson was of the opinion that Mr. Kehnast's tinnitus was caused by the accident. (Tr–455). Dr.

Robinson disagreed that a hearing aid would be the appropriate treatment. (Tr–455).

### 4. Injuries of Plaintiff Eileen Fitzpatrick

The Plaintiff Eileen Fitzpatrick was 19 years old and the driver of her vehicle which was stopped at a traffic signal on Delaware Route 7, northbound, on March 15, 1985 when her vehicle was rear ended by the Kehnast vehicle which had been hit by the vehicle driven by Sergeant Davis. Ms. Fitzpatrick's vehicle in turn collided with the vehicle driven by Billy Sebock. Ms. Fitzpatrick's left side was thrown into the steering wheel and then she was thrown back into her seat. Ms. Fitzpatrick ran back to Davis' car and opened the passenger door to try to get him out and doesn't remember anything else after this attempt until she woke up back in her car. Ms. Fitzpatrick was taken by ambulance to the hospital where she was given a cervical collar, medication and had x-rays taken. Ms. Fitzpatrick was experiencing pain in her back and neck, stiffness, and soreness in the chest from striking the steering wheel.

Ms. Fitzpatrick followed up treatment the next day, March 16, 1985, with Joseph Rooney, D.C., a chiropractor. At this initial visit Dr. Rooney performed x-rays, an examination, administered chiropractic manipulation of her back and neck, applied heat pads to her back and neck, and administered massage therapy to the same regions. Ms. Fitzpatrick continued to see Dr. Rooney for treatment of this same basic type at least five days a week, and sometimes an additional weekend day if she was experiencing pain, over the first three months following her injury. Ms. Fitzpatrick testified that these treatments provided her with temporary pain relief as to her back and neck. She was also experi-

---

**16.** The Defendant United States puts forth the argument that the diagnosis of tinnitus cannot be objectively verified, because it is diagnosed based solely on the patient's complaints, in an effort to discredit the diagnosis of tinnitus in Alan Kehnast. The Court, however, believes that the diagnosis is credible as both Dr. Rosenberg and Dr. Robinson felt the accident of March 15, 1985 could cause the mild hearing

loss Mr. Kehnast was experiencing which in turn would cause the tinnitus.

**17.** Dr. Robinson, an otolaryngologist, explained at trial that tinnitus is a true internal sound generated between the ear and the brain. It reflects a scar in the hearing mechanism and results in an undesirable noise. (Tr–440–41).

encing headaches which were also helped somewhat by Dr. Rooney's treatments. In the second three months following the accident Ms. Fitzpatrick's visits to Dr. Rooney lessened to three times a week as she was working at this time and had to leave work for these visits.

In June of 1985, Ms. Fitzpatrick was seen by Dr. Barry White, a neurologist, for the purpose of an independent medical exam for the personal injury protection carrier. At this first visit Dr. White testified that he felt Ms. Fitzpatrick had a strain-type injury to the neck and back and that she would continue to improve slowly and continually with an odd flare-up at times. (Tr–607). Dr. White felt that if the chiropractor was helping she might go two or three times a week and felt she would be largely cleared up in three to six months time. (Tr–607).

Subsequent to the March 15, 1985 accident, Ms. Fitzpatrick was involved in another automobile accident on September 26, 1985. Prior to this accident, Ms. Fitzpatrick was treating with Dr. Rooney about two times a week and she was feeling better in that she knew how to cope with her back problem and learned what not to do to aggravate it. After, the September 26, 1985 accident, however, she felt much worse and testified that she went downhill after this second accident. Ms. Fitzpatrick continued in treatment with Dr. Rooney after the second accident.

In addition to seeing Dr. Rooney, Ms. Fitzpatrick began treating with Dr. Pierre Leroy on October 13, 1986. Dr. Leroy found Ms. Fitzpatrick's complaints of pain in the back of the neck radiating down each shoulder slope, both to the left and to the right, and in the low back across the hip line extending into both buttocks, to be genuine and to be consistent with her history and the physical findings of the exam. (Leroy Depo.–13). His diagnosis at that time included cervical/dorsal myositis, post traumatic headaches, and a lumbosacral strain. On the last visit with Dr. Leroy on October 9, 1989, when there were two posi-

tive test results, thoracic outlet syndrome was also diagnosed for Ms. Fitzpatrick. Dr. Leroy over the course of treatment of Ms. Fitzpatrick recommended restriction of activities which aggravated her condition, local heat to the neck and low back areas, medication as needed,[18] continuation of home therapy, visits to Dr. Rooney as needed, and consultation with Dr. Leroy again if necessary. Dr. Leroy feels these recommendations represent the treatment in the forseeable future that Ms. Fitzpatrick will require. (Leroy Depo–33). He also believes she will continue to suffer pain as a result of her injuries. (Leroy Depo–34). Dr. Leroy does not think that Ms. Fitzpatrick will need surgery.

Dr. Leroy testified in his deposition that during the course of treatment of Ms. Fitzpatrick she was in pain, experiencing a recurring type of pain. (Leroy Depo–26). In Dr. Leroy's opinion within reasonable medical probability, based on the history given by the patient, physical findings and the laboratory data, Ms. Fitzpatrick's symptoms of cervical/dorsal and low back pain are causally related to the March 15, 1985 motor vehicle accident. (Leroy Depo–31). It was also Dr. Leroy's opinion that the second accident on September 26, 1985 aggravated her pre-existing cervical/dorsal and low back symptoms. He would estimate her partial permanent impairment from the March 15, 1985 accident to be, cervical/dorsal, 10 percent, and low back, 10 percent. (Leroy Depo–31–32).

Dr. White saw Ms. Fitzpatrick on two other occasions on behalf of the United States Government. Dr. White saw Ms. Fitzpatrick for the second time in June of 1987. At this time he found no clinical evidence of radiculopathy or thoracic outlet syndrome. (Tr–608). Dr. White disagreed with Dr. Leroy's diagnosis of thoracic outlet syndrome. The third time that Dr. White saw Ms. Fitzpatrick was in July of 1989. At this examination Dr. White found no significant dysfunction in comparison with the previous examinations and that there was, if anything, an improvement

---

18. In summary, Ms. Fitzpatrick was maintained on non-steroidal medications, anti-spasmodic medications, and as-needed medications for stress, anxiety and depression.

from what had previously seemed to be a minor cervical lumbosacral sprain-type injury. (Tr–609). Dr. White didn't believe that Ms. Fitzpatrick showed any signs of permanent injury. (Tr–610).

Dr. White at this time noted that he felt the second accident may have been a more significant one in causing dysfunction to Ms. Fitzpatrick. (Tr–611). He also stated, however, that it would be reasonable to say that after the second accident Ms. Fitzpatrick had to deal with not only the effects of that accident but the effects of the first one. He felt the effects from the first accident should, to a certain degree, have largely, though not necessarily, totally cleared by the time of the second accident. (Tr–646). Dr. White testified that he thought one might be able to view each accident in and of itself. (Tr–646).

## B. Conclusions of Law

### 1. Negligence of Sergeant Willie Davis

The negligence of Sergeant Willie Davis in the operation of a government leased motor vehicle on March 15, 1985, has been stipulated by the parties. At trial through the testimony of the Plaintiffs, Alan Kehnast, Cheryl Kehnast, and Eileen Fitzpatrick and the testimony of Sergeant Davis, it was established that Sergeant Davis' negligent operation of his government leased motor vehicle was the proxi-mate cause of the collision which resulted in the injuries to the Plaintiffs.

### 2. Liability of Defendant, United States of America

#### a. The Negligence Claims

All of the Plaintiffs have submitted claims against the Defendant, United States of America, and seek to hold it liable for the injuries proximately caused by the negligence of Sergeant Davis. The Plaintiffs seek to have the Defendant United States of America held liable for the negligence of Sergeant Davis pursuant to 28 U.S.C. §§ 1346(b) and 2671.[19] (The Federal Tort Claims Act).

#### b. Standard for the Imposition of Liability Under the Federal Tort Claims Act

The threshold requirement in order for the United States to be held vicariously liable for the torts of its employees is that the employee must have been acting within the scope of his employment when the tort was committed. *Short v. United States*, 245 F.Supp. 591, 592 (D.Del.1965). A member of the United States military is deemed to be acting within the scope of his or her employment, for purposes of 28 U.S.C. § 1346(b), if he or she is "acting in the line of duty." 28 U.S.C. § 2671. Under the Federal Tort Claims Act the law of *respondeat superior*, of the state in which

---

**19.** Section 1346(b) provides the following:

(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on or after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred ...

28 U.S.C. § 1346(b).

Section 2671 provides the following:

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

"Employee of the government" includes officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under sections 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

"Acting within the scope of his office or employment", in the case of a member of the military or naval forces of the United States or a member of the National Guard as defined in Section 101(3) of title 32, means acting in the line of duty.

28 U.S.C. § 2671.

the negligent act by the employee occurred, is the applicable law and governs the determination of the scope of employment. *McSwain v. United States,* 422 F.2d 1086, 1088 (3d Cir.1970). Therefore, in the present case since the collision occurred in the State of Delaware, its concepts of the doctrine of *respondeat superior* will be applied by this Court.

### c. Delaware Law on the Scope of Employment

█ The leading Delaware case regarding the resolution of the issue of an employee's scope of employment is *Coates v. Murphy,* 270 A.2d 527 (Del.1970). The Delaware Supreme Court adopted the analysis set forth in *Restatement 2d, Agency 2d,* § 228;

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) It is of a kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and * * *.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or *too little actuated by a purpose to serve the master.*

*Coates v. Murphy,* 270 A.2d 527, 528 (Del. 1970). As the parties and this Court have recognized the focus for this inquiry must be on the moment when the tort occurred. *Short,* 245 F.Supp. at 593. Thus the Court will not delve into the circumstances at the officers' club but will instead focus on the moment when the vehicle driven by Sergeant Davis collided with those vehicles of the Plaintiffs.

█ Using the *Restatement* as a guide and the moment of the collision as a focal point this Court finds that Sergeant Davis was acting within the scope of his employment at the time his vehicle collided with

that of the Plaintiffs. The conduct Sergeant Davis was engaged in at the moment of the collision comports with the criteria set forth in § 228(1) of the *Restatement.* In fact Davis' conduct at the time of the accident is contrary to the necessary finding of § 228(2), as his conduct was exclusively "actuated by a purpose to serve the master."

Sergeant Davis was authorized to obtain overnight accommodations in accordance with his weekend long assignment in Delaware. His weekend long assignment was given to him by his employer the United States Army. His purpose for being in Delaware for the weekend was to serve his employer by assisting the 116th M.A.S.H. unit with training exercises over the next two days. In order to satisfy this purpose for being in Delaware, it was necessary for Sergeant Davis to obtain overnight accommodations.

At the moment the collision occurred Sergeant Davis was en route to his overnight accommodations, his military billet, he had procured earlier that evening. At the trial Sergeant Davis testified that he believed when he left the officers' club he was headed to the Macintosh Inn where he had checked in previously that evening. (Tr– 475). The Court does not question the directness of Davis' route to his military billet and does not find, as has been urged by the Defendant, that Davis had abondoned his master's business and was purely on a frolic of his own during the moments leading up to the accident.[20] The Court also finds that Davis' intoxication at the time of the collision, though an illegal act, does not remove him from the scope of his employment.

### d. The Applicability of the "Special Mission" Exception

█ The scope of employment inquiry of the *respondeat superior* doctrine is a difficult one to assess. The inquiry is aimed at allocating the risks such that the business

---

**20.** The Court finds that the "AAA" map offered by counsel for the government which noted the National Guard installation, the motel where Willie Davis had registered and the place of the accident, is irrelevant to the question of whether Davis had deviated from his master's route and the Court has not considered it in making that determination.

is responsible only for those risks associated with its operation. This risk allocation scheme relieves an employer of liability for those torts of an employee which occur outside the scope of his employment. In accord with this reasoning this Court has recognized "the going and coming" rule which generally relieves an employer from liability for the torts of an employee when the employee is going to or returning from his place of employment. *Short*, 245 F.Supp. at 593. However, when the employee is on a "special mission" an exception to this rule is triggered and the normal risks inherent in the employee's travels will shift to the employer. *Id.* This "special mission" exception arises when the employer calls the employee away from his regular place of work for the purposes of the employer and to benefit the employer.

This exception is applicable:

> If the employee is not simply on his way home to his normal place of work or returning from said place to his home for his own purpose, but is coming from his home or returning to it on a special errand either as part of his regular duties or at a specific order or request of his employer, the employee is considered to be in the scope of his employment from the time that he starts on the errand until he has returned or until he deviates therefrom for personal reasons. * * *.

*Short*, 245 F.Supp. at 593, *quoting Boynton v. McKales*, 139 Cal.App.2d 777, 294 P.2d 733 at 740 (Cal.Ct.App.1956).

■ In applying the above test to the present case, an examination of the facts show that Sergeant Davis was on a special errand or mission for the entire weekend, from the time he left Fort Meade, through the weekend of training maneuvers in Delaware, until the time he would return to Fort Meade. He was, therefore, within the scope of his employment for the duration of this "special mission" in Delaware. He was, thus, necessarily within the scope of his employment at the time of the accident, since he was returning to his military billet for the evening and had not deviated from his mission for personal reasons.

In addition this Court has recognized the need for a flexible approach when dealing with an employee who serves his employer's interests at various times and various places since the "going and coming" rule is "geared to a usual place of work in normal working hours" and is "intended to limit an employer's liability for his employee's acts to a specific place during specific hours." *Short*, 245 F.Supp. at 594. In this case Sergeant Davis in his capacity as a medical advisor for the National Guard and the Army Reserves in Delaware, Maryland, and Virginia, and the District of Columbia, was regularly required to go to various units located in these states, sometimes overnight or for an entire weekend. It is this type of situation precisely that the Court finds warrants a broad and flexible approach in defining the scope of employment.

*e. The Negligent Entrustment Claim*

■ Plaintiffs Cheryl Kehnast and Alan Kehnast have advanced a second theory of liability, i.e. that the United States is liable because it negligently entrusted a motor vehicle to Sergeant Davis. This Court has given consideration, for the second time, to this claim and the United States' argument that the discretionary function exception to potential liability under the Federal Tort Claims Act is applicable to the present situation. The United States contends once again that the decision of the United States Army to return Willie Davis to his post after the 1984 arrest for driving under the influence, requiring that he be entrusted from time to time with a vehicle for his use as part of his official responsibilities, is a protected decision under the discretionary function exception to the Federal Tort Claims Act.

The United States' position is based on its argument that this decision involved an element of judgment or choice, and was a decision grounded in military and economic policy. The Court, however, finds once again no merit in the United States' position and refers to its reasoning in its Opinion of December 7, 1989. This Court restates its position that in its view the decision to entrust a motor vehicle to Sergeant

Davis is not one based upon any particular economic or social policy but a more localized and routine decision in nature.

■ The Court characterizes the decision to entrust a motor vehicle to Sergaent Davis such that it falls outside the protection of the discretionary function exception. However, the Court does not find based on the circumstances in this case that entrusting the vehicle to Sergeant Davis on March 15, 1985 was negligent. Therefore, under this second theory of liability advanced by the Plaintiffs Cheryl and Alan Kehnast the United States is not liable.

At the trial it was established through the testimony of Sergeant Davis that the arrest in March of 1984, for driving under the influence, was his first such offense and that prior to that time he had a 20–year record of high evaluations for his service performance. (Tr–491). Sergeant Davis also testified that he had not had a drink since the March 1984 incident. Further, Colonel Carson testified that he had been watching Davis during this period, between the 1984 arrest and the March 15, 1985 accident, and had seen no evidence of alcohol abuse nor had he seen any evidence of such abuse prior to the 1984 incident. (Tr–555).

Sergeant Davis was indeed given sanctions as a result of the 1984 incident in that he had his on-post driving privileges revoked for one year, and was ordered to attend a mandatory rehabilitation program. Sergeant Davis was well aware of the risk a further such driving incident would have on his military career. (Tr–494). The Court finds that it would not have been unreasonable or negligent on the part of the United States to entrust a vehicle to Davis. He had only one prior drinking incident, had complied with the punishment he received as a result of the one incident and was performing well after the incident in 1984.

## C. Damages

In determining the amount a personal injury plaintiff may be entitled to recover, the Court may consider the plaintiff's lost wages, future lost wages or diminished earning capacity, pain and suffering, medical expenses, permanent injuries and loss of consortium whenever an injured plaintiff is married. However, "[t]he law does not permit a recovery of damages which is merely speculative or conjectural." *Henne v. Balick*, 146 A.2d 394, 396 (Del.1958). "There must be some reasonable basis upon which a [court] may estimate with a fair degree of certainty the probable loss which plaintiff will sustain in order to enable it to make an intelligent determination of the extent of this loss. The burden is on the plaintiff to furnish such proof. If [the plaintiff] fails in this respect, the [court] cannot supply the omission by speculation or conjecture." *Id.*

In the present case, this Court has found there to be a lack of proof as to some of the elements of a recovery mentioned above. As part of the following discussion on damages, in which the Court discusses what each plaintiff is entitled to, any deficiencies in the proof as to damages will also be discussed.

### 1. Lost Wages

The Court finds that none of the Plaintiffs have presented sufficient evidence regarding lost wages for which compensation was not available under 21 *Del.C.* § 2118.

### a. The Plaintiff Alan Kehnast

■ Prior to the accident Alan Kehnast worked for and was President of the family oil delivery business "Texas Oil," also called W.F. Kehnast Company. Mr. Kehnast worked as a mechanic. Alan Kehnast testified that he was unable to work after the accident of March 15, 1985 until the early part of May 1986. However, at trial Mr. Kehnast acknowledged that he received approximately $350.00 a week from his mother and father on their personal account for the two or three months after the accident. Mr. Kehnast also identified checks on the Texas Oil Company account that were signed by his mother and endorsed by him. These checks began with a check dated May 1985 in the amount of $570.00.

At trial Mr. Kehnast explained that these checks first drawn on his parent's personal account and then on the Texas Oil Company account were a loan to help his family survive since the insurance checks were coming in very slowly. (Tr–198). However, Mr. Kehnast further acknowledged that there is not any way to distinguish between the checks he received up until May of 1986 and the regular paychecks he began getting from the Texas Oil Company when he went back to work in May of 1986. (Tr–199). These checks beginning on May 23, 1985 and going through the beginning of May of 1986 total $21,317.30 with the total number of checks being 55. In addition to the receipt of these checks on the Texas Oil account Alan Kehnast is listed as the mechanic on work orders during the period of time he testified he was unemployed.

Mr. Kehnast claims that the money he received on the Texas Oil Company account during the time he was out of work was a loan. He states that this loan, that he is required to repay, is evidenced by an agreement dated March 1985, on Texas Oil Company letter head, and signed by his parents and himself. The Court finds this document lacks credibility and is self serving. The Court views the receipt of funds, by Alan Kehnast, in the amount of $21,317.30 and the fact that Alan's name appears on work orders dated between March of 1985 and April of 1986, as representing to this Court that the Plaintiff Alan Kehnast was not prevented by his injuries from continuing his employment and collecting his full salary even within a very short period of the accident. Mr. Kehnast testified that the amount he received, $21,317.30, was about that rate of pay he would have received had he been working. (Tr–241). Therefore, Mr. Kehnast is not entitled to any lost wages after the expiration of the two year period under 21 *Del.C.* § 2118, as there was not sufficient proof produced at trial.

*b. The Plaintiff Eileen Fitzpatrick*

The Plaintiff Eileen Fitzpatrick was out of work approximately three and half weeks after the accident. Ms. Fitz-patrick then returned to work on April 10, 1985 on a part time basis. Dr. White who first saw the Plaintiff in June of 1985 agreed that she was not capable of doing a full day's work. (Tr–607). Ms. Fitzpatrick continued working on a part time basis up until September 26, 1985 when she was involved in a second accident. Ms. Fitzpatrick was out of work following the second accident on September 26, 1985 until February of 1988.

The Court finds there is insufficient proof to award lost wages for the time period after March 15, 1987, the expiration of the two year period under 21 *Del.C.* § 2118. There is not enough evidence for the Court to evaluate the effects of the first accident, the accident of March 15, 1985, on the injuries sustained by the Plaintiff in the second accident. Furthermore, Dr. White indicated that Ms. Fitzpatrick's inability to work was overstated when he examined her in June of 1987. (Tr–613).

*c. The Plaintiff Cheryl Kehnast*

Ms. Cheryl Kehnast is not entitled to any compensation for the loss of her services. She was unemployed at the time of the accident and the Court finds there was insufficient proof presented at trial for the Court to award compensation for her lost services as a housewife. The Court would have found it possible to award such compensation had the proper evidence been produced at the trial. For example an actuarial expert who could have testified regarding the loss of family services would have allowed the Court to make an award for lost wages for her services. *Sweeney v. Car/puter Intern. Corp.*, 521 F.Supp. 276, 287 (D.S.C.1981).

### 2. Diminished Earning Capacity/Future Lost Wages

The Court is unable to award any recovery to any of the Plaintiffs for diminished earning capacity or future lost wages. The Court finds the evidence presented at trial was insufficient for the Court to base an award. This Court agrees with the statement made by the Supreme

Court of Delaware in *Henne v. Balick*, 146 A.2d 394, 396 (Del.1958), that "the mere showing of permanent injuries, ... is, of itself, ... [in] sufficient evidence of the extent of the impairment of plaintiff[s'] earning capacity. To support a finding of a specific sum of damages there should generally be other evidence than that which merely shows the nature of plaintiff[s'] injuries and his [or her] vocation."

### a. The Plaintiff Alan Kehnast

■ There was not sufficient evidence produced at trial as to a diminished earning capacity for Mr. Kehnast. At trial it was learned that Mr. Kehnast is self employed in the fuel delivery and lawn care business. However, there was no indication as to whether he was experiencing a diminished earning capacity due to his injuries. The only other evidence presented at trial in reference to Mr. Kehanst's employment was the restriction on lifting given by Dr. Monteleone. However, this was in no way related, at the trial, to any diminished earning capacity or future lost wages Mr. Kehnast might experience.

### b. The Plaintiff Eileen Fitzpatrick

■ There was not sufficient proof presented at trial to support an award for diminished earning capacity to the Plaintiff Eileen Fitzpatrick. There was not sufficient evidence to support a finding that Ms. Fitzpatrick's injuries interfered with her capability of earning a living. No evidence was presented which showed she could not return to work as a beautician. Dr. White even suggested the use of a stool would alleviate any problems she thought she might have and allow her to continue cutting hair. In contrast to the injuries sustained by the plaintiff in *Bush v. Oscoda Area Schools*, 109 Mich.App. 373, 311 N.W.2d 788, 792 (App.1981),[21] Ms. Fitzpatrick could continue her career as a beautician with the minimal adjustment of perhaps sitting on a stool.

### c. The Plaintiff Cheryl Kehnast

■ As stated in the section on "Lost Wages" had there been some evidence as to the value of Ms. Kehanst's loss of services to her family, both past and future, the Court may have been able to grant recovery. However, there ·was insufficient evidence presented at trial upon which this Court can base an award for diminished earning capacity. "Damages for permanent impairment of future earning capacity may not be based on speculation, probabilities, or uncertainty, but must be shown by competent evidence that such damages are reasonably certain as the proximate result of the pleaded injury." *Uryasz v. Archbishop Bergan Mercy Hopital*, 230 Neb. 323, 431 N.W.2d 617, 622 (1988).

### 3. Medical Expenses

■ The Court finds that none of Plaintiffs presented evidence at trial regarding medical expenses for which compensation was not available under 21 *Del.C.* § 2118. The indefinite nature of the future treatment required by each Plaintiff and the lack of any evidence as to any such expenses does not allow the Court to award any compensation for medical expenses incurred after the expiration of the two year period during which no fault benefits were available to the Plaintiffs.

### 4. Loss of Consortium

■ In order for the Court to make an award on a loss of consortium claim the party asserting the claim, in this case both Alan and Cheryl Kehnast, must show that as a result of the physical injury the other has experienced, each has been deprived of some benefit which formerly existed in the marriage. *Newman v. Exxon Corp.*, 722 F.Supp. 1146, 1149 (D.Del.1989). Regarding the claim for loss of consortium, presented in this case, by both Alan Kehnast and Cheryl Kehnast, the Court finds there to be a limited amount of evidence upon which to base an award for this claim.

---

**21.** In this case, the plaintiff's hand was badly burned such that she would at a minimum be required to wear gloves when handling any chemicals. Also she had a poor ability to spread her fingers on her burned hand.

■ There was some testimony by Cheryl Kehnast as to the strain their marriage experienced as a result of the accident. Alan experienced weight gain which Cheryl attributed to the inactive lifestyle they were forced to have as a result of the accident. Also there was some testimony by Cheryl Kehnast that the number of intimate relationships between them had decreased after the accident. However, each of these persons was dealing with the effects of their own injuries, which no doubt contributed to the anxiety between them. On the basis of the testimony at trial the Court concludes that fair compensation to each of Alan Kehnast and Cheryl Kehnast, for damages resulting from loss of consortium due to the other's injuries is $1,000.00.

### 5. Pain and Suffering

There is no mathematical formula in which to determine compensation for pain and suffering. In making this estimate the Court has considered the evidence produced at trial which described the nature and extent of injuries to each Plaintiff, the suffering each endured as a result of their injuries, the permanency of any injuries, and the duration of any pain associated with the injuries. In this case there was evidence produced at trial both as to the pain and suffering each Plaintiff has already experienced and the pain and suffering each might experience in the future. The Court has made the following awards for pain and suffering to each Plaintiff to compensate them for both past and future pain and suffering in reference to their life expectancies from the date of the accident.

■ To the Plaintiff Eileen Fitzpatrick the Court finds fair compensation for pain and suffering to be in the amount of $29,-500.00. From the date of the accident Ms. Fitzpatrick's life expectancy is 59 years and the Court awards $500.00 for each of these years.

■ To the Plaintiff Alan Kehnast the Court finds fair compensation for pain and suffering to be in the amount of $45,300.00. From the date of the accident Mr. Kehnast's life expectancy is 45.3 years and the Court awards $1,000.00 for each of these years.

■ To the Plaintiff Cheryl Kehnast the Court finds fair compensation for pain and suffering to be in the amount of $63,-720.00. From the date of the accident Ms. Kehnast's life expectancy is 53.1 years and the Court awards $1,200.00 for each of these years.

### 6. Mitigation of Damages

■ In addressing the United States of America's argument of failure to mitigate damages as to all of the Plaintiffs, the Court is not in complete agreement. First in reference to the claims by Defendant that Ms. Fitzpatrick failed to mitigate her damages, the Court has taken into account that this Plaintiff did not return to work when she was capable of doing so when it denied an award for lost wages. As to her efforts to train herself for other kinds of work, the Court believes that this Plaintiff has made sufficient efforts, in that she obtained a job at a bank where she received on the job training and at the time of trial was planning to start paralegal school.

■ In reference to the Plaintiff, Alan Kehnast, the Court has taken into account his failure to have the recommended surgery for his thoracic outlet syndrome, when deriving an award for pain and suffering. At trial Dr. Davies testified that he believed nothing would relieve Mr. Kehnast's symptoms except decompressing or taking the pressure off the first rib by surgery.

■ In reference to the claims by the Defendant that Ms. Kehnast failed to mitigate her damages, the Court cannot agree. The Court finds that the Plaintiff, Ms. Kehnast, was not obligated to undergo a second shoulder manipulation procedure since her treating physician, Dr. Smoluck, testified to his uncertainty that it would alleviate her pain or improve her condition. The Court also finds that contrary to what Defendant asserts, Ms. Kehnast was general-

ly a cooperative patient according to her treating physician, Dr. Smoluck.